UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

ALFRED ROSS WINGATE, JR.,

Defendant.

_____/

Criminal Case No. 11-20481

SENIOR U.S. DISTRICT JUDGE
ARTHUR J. TARNOW

**OPINION AND ORDER PARTIALLY GRANTING ALFRED ROSS WINGATE, JR.'S MOTIONS FOR REDUCTION IN SENTENCE [340, 343]**

On March 21, 2013, a jury found Alfred Wingate guilty of one count of conspiracy, in violation of 18 U.S.C. § 371, one count of bank robbery, in violation of 18 U.S.C. § 2113, two counts of pharmacy robbery, in violation of 18 U.S.C. § 2118, three counts of using or carrying a firearm during a federal crime of violence, in violation of 18 U.S.C. § 924(c), and two counts of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). (ECF No. 160). On August 28, 2013, Wingate was sentenced to fifty-seven years in prison. (ECF No. 203, PageID.2055).

On April 5, 2021, Wingate moved for compassionate release under 18 U.S.C. § 3582(c)(1)(A). (ECF No. 340). The Court appointed counsel and set a briefing schedule the next day. (ECF No. 341). On May 11, 2021, following submission of

the briefs, the Court held a hearing and requested supplemental briefs, which have since been filed. For the reasons articulated below, Wingate's Motion to Reduce Sentence [343] is **GRANTED in part and DENIED in part**.

## BACKGROUND

Wingate was born in Highland Park, Michigan, in 1970, and is the youngest of five siblings. (PSR ¶¶ 79-80). Wingate's childhood was marked by significant trauma. Although Wingate's parents separated when he was very young, he witnessed "brutal fights" between them before they parted. (*Id.* ¶ 83). Thereafter, Wingate was raised by his mother with significant help from his oldest sister—at the time, a young teenager. (*Id.* ¶¶ 80, 83). Indeed, Wingate's sister provided so much of his day-to-day care, including at one point rescuing him from a fire, that he believed her to be his mother. (*Id.* ¶ 84). The man Wingate's mother eventually remarried was murdered while Wingate was still a teenager. (*Id.*).

Deprived of support and without a consistent role model, Wingate eventually began running away from home. (*Id.*). By the age of fifteen, he had become ensnared in the juvenile court system. (*Id.*). Two years later, at age seventeen, he was sent to prison on drug charges. (*Id.* ¶¶ 72-73). In the thirty-two years since, he has been in prison nearly without pause.

The crimes for which Wingate traded so much of his life were serious. At age twenty-one, Wingate was convicted of second-degree murder for killing a person

from whom he was attempting to purchase crack-cocaine. (*Id.* ¶ 74). After almost nineteen years in prison, Wingate was released on parole. (*Id.*).

Upon release, Wingate sought and received approval from the City of Detroit to open a Halal deli. (*Id.* ¶ 90). Unfortunately, in May 2011, barely five months after opening, Wingate was forced to close down after failing to pay his landlord a $15,000 fee necessary to bring the space "up to code." (*Id.*). It was around this time, less than a year after he had been released from state custody, that Wingate committed the instant offenses.

Over the course of two months, Wingate and several others carried out armed robberies of a bank and two pharmacies. (*Id.* ¶¶ 12-19). Wingate neither planned the robberies nor discharged the firearms he had been given to carry them out. (*Id.* ¶¶ 12-23). Nevertheless, he threatened bystanders at gunpoint and struck someone in the back of the head with a gun. (*Id.* ¶¶ 13, 15-18). Saddest of all, Wingate tricked his son, Christian Reid, into acting as the getaway driver for the third robbery by telling him he was taking him for a haircut. (*Id.* ¶¶ 20-22, 81). He becomes emotional when discussing the effect of his choice on Reid. (*Id.* ¶ 26).

Wingate is fifty-one years old, incarcerated at USP Atwater, and scheduled for release on March 3, 2060, at the age of eighty-nine. *Find an Inmate*, FED. BUREAU PRISONS, https://www.bop.gov/mobile/find_inmate/index.jsp (BOP Register No. 46001-039) (last visited July 2, 2021).

ANALYSIS

Section 3582(c)(1) of Title 18 of the U.S. Code, colloquially known as the

compassionate release statue, provides, in relevant part:

> **(A)**    [T]he court, upon motion of the Director of the Bureau of
> Prisons, or upon motion of the defendant after the defendant has
> fully exhausted all administrative rights to appeal a failure of the
> Bureau of Prisons to bring a motion on the defendant's behalf or
> the lapse of 30 days from the receipt of such a request by the
> warden of the defendant's facility, whichever is earlier, may
> reduce the term of imprisonment (and may impose a term of
> probation or supervised release with or without conditions that
> does not exceed the unserved portion of the original term of
> imprisonment), after considering the factors set forth in section
> 3553(a) to the extent that they are applicable, if it finds that—
>> **(i)**    extraordinary and compelling reasons warrant such a
>> reduction.
>
> [. . .]
>
> and that such a reduction is consistent with applicable policy
> statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1).

Before a petitioner moves for compassionate release under § 3582(c)(1), they

must either exhaust their administrative remedies with the BOP or wait thirty days

from when they filed a request with their warden. *United States v. Alam*, 960 F.3d

831, 832 (6th Cir. 2020). Once the exhaustion requirement is deemed satisfied,

district courts proceed through a three-step inquiry:

> At step one, a court must "find[]" whether "extraordinary and
> compelling reasons warrant" a sentence reduction. 18 U.S.C. §
> 3582(c)(1)(A)(i). At step two, a court must "find[]" whether "such a
> reduction is consistent with *applicable* policy statements issued by the

> Sentencing Commission." *Id.* § 3582(c)(1)(A) (emphasis added). At
> step three, "§ 3582(c)[(1)(A)] instructs a court to consider any
> applicable § 3553(a) factors and determine whether, in its discretion,
> the reduction authorized by [steps one and two] is warranted in whole
> or in part under the particular circumstances of the case." [*Dillon v.
> United States*, 560 U.S. 817, 827 (2010).]

*United States v. Jones*, 980 F.3d 1098, 1107-08 (6th Cir. 2020) (first four alterations

in original) (footnotes omitted). In addition, where, as here, the incarcerated person

files a motion on their own behalf, the Sentencing Commission's policy statement

on compassionate release, § 1B1.13 of the Sentencing Guidelines, is not

"applicable," and "district courts need not consider it." *United States v. Elias*, 984

F.3d 516, 519 (6th Cir. 2021). In such cases, "district courts have discretion to define

'extraordinary and compelling' on their own initiative." *Id.* at 519-20 (citing *Jones*,

980 F.3d at 1111; *United States v. Ruffin*, 978 F.3d 1000, 1007 (6th Cir. 2020)).

Finally, if "any of the three prerequisites listed in § 3582(c)(1)(A) [are] lacking," the

motion for compassionate release can be denied the other requirements need not be

addressed. *Id.* at 519.

## I.  Exhaustion

Wingate made an administrative request for reduction in sentence on January

5, 2021.  (ECF No. 343-1, PageID.4484). Warden Ciolli of USP Atwater denied

Wingate's request on January 12, 2021. (ECF No. 343-1, PageID.4486). The

Government concedes that Wingate has satisfied § 3582(c)(1)(A)'s exhaustion requirement. (ECF No. 344, PageID.4530).

## II. Extraordinary and Compelling Reasons for Release

Wingate argues that when taken together, his asthma, rehabilitation, and lengthy mandatory minimum sentence, which he could not have received under current law, constitute extraordinary and compelling reasons for a reduction in sentence. (ECF No. 340, PageID.4424; 4431; ECF No. 343, PageID.4471-72). The Court agrees.

### a. Asthma

The CDC recognizes that "[c]hronic lung diseases," including asthma, "can make [individuals] more likely to get severely ill from COVID-19." *People with Certain Medical Conditions*, CTRS. FOR DISEASE CTRL. & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html [https://perma.cc/EE29-M7B2] (last updated Apr. 29, 2021). Wingate has suffered from asthma for over a decade and is prescribed an albuterol inhaler to prevent and relieve attacks. (PSR ¶ 85; ECF No. 343-1, PageID.4516-21). In addition, despite the availability of COVID-19 vaccinations, USP Atwater continues to suffer from active COVID-19 infections. *See COVID-19 Coronavirus*, FED. BUREAU PRISONS, https://www.bop.gov/coronavirus/ [https://perma.cc/H5VD-XD8E] (last updated July 1, 2021) (two active cases among

staff; so far, approximately forty percent of inmates have contracted COVID-19 and recovered). Wingate himself tested positive for COVID-19 on December 18, 2020, and declined vaccination on January 28, 2021. (ECF No. 346-1, PageID.4566, 4596; ECF No. 346-2, PageID.4620).

"Courts in [the Sixth Circuit] have consistently refused to find extraordinary and compelling medical circumstances when a defendant declines the COVID-19 vaccine." *United States v. Toney*, No. 17-20184, 2021 U.S. Dist. LEXIS 59301, at *4 (E.D. Mich. Mar. 29, 2021). *But see, e.g.*, *United States v. Wardlow*, No. 2:19-CR-20254, 2021 U.S. Dist. LEXIS 81161, at *9 (E.D. Mich. Apr. 28, 2021) (finding extraordinary and compelling circumstances and granting motion, in part based on medical conditions, despite defendant having likely received two vaccine doses); *cf. United States v. Austin*, No. 15-20609, 2021 U.S. Dist. LEXIS 56340, at *4 n.1 (E.D. Mich. Mar. 25, 2021) (implying that a different calculus might apply where a defendant provided a valid reason for declining the vaccine).

During the hearing, Wingate explained that he was initially afraid to get the vaccine due to how little information the BOP had provided about it and the fact that, at the time it was offered to him, the majority of staff members at USP Atwater, including medical personnel, had not taken it. Indeed, it appears that under the official guidance in place at the time, Wingate should not even have been offered the vaccine because he had so recently recovered from COVID-19. *See Dr. Anthony*

*Fauci on COVID-19 Response and Vaccine Distribution*, C-SPAN (Jan. 6, 2021), https://www.c-span.org/video/?507714-1/dr-anthony-fauci-covid-19-response-vaccine-distribution/ [https://perma.cc/UFK5-7GJN] (video interview of Dr. Anthony Fauci, director of the National Institute of Allergy and Infectious Diseases, at 8:11, explaining that anyone who has been infected with COVID-19 "should wait about ninety days" before getting the vaccine).

Ultimately, because Wingate's asthma is only "mild," as opposed to "moderate or severe," it does not factor in the Court's decision. (ECF No. 346-1, PageID.4566). Nevertheless, the above context persuades the Court that Wingate's initial vaccine hesitancy should not preclude a reduction in sentence, particularly when based primarily on non-medical circumstances. These include extreme sentence disparity and rehabilitation.

### b. Sentence Disparity

Prior to the enactment of the First Step Act ("FSA"), "individuals convicted of two § 924(c) charges faced a mandatory-minimum sentence of thirty years' incarceration regardless of their prior criminal history (five years for the first and twenty-five years for the second § 924(c) conviction) and twenty-five years' incarceration for each additional § 924(c) conviction." *United States v. Henry*, 983 F.3d 214, 217 (6th Cir. 2020). This practice came to be known as "stacking." *See id.* at 229. Pursuant to § 403(a) of the FSA, however, "only a defendant who has a prior

*final* § 924(c) conviction is subject to the escalating mandatory-minimum sentences for a subsequent § 924(c) conviction." *Id.* at 217 (emphasis added). But Congress did not make § 403(a) fully retroactive. *See* FSA § 403(b). Rather, it applies only to defendants who did not "have a valid sentence at the time of the [FSA's] enactment" on December 21, 2018. *Henry*, 983 F.3d at 222. Thus, for a defendant who was sentenced prior to the enactment of the FSA, such as Wingate, § 403(a) not only offers no recourse, but creates an extraordinary disparity.

The Sixth Circuit's caselaw initially implied that district courts should not take such disparities into account in the extraordinary and compelling circumstances analysis. *See United States v. Tomes*, 990 F.3d 500 (6th Cir. 2021) (refusing to "us[e] § 3582(c)(1)(A) as an end run around Congress's careful effort to limit the retroactivity of the First Step Act's reforms"); *United States v. Wills*, 991 F.3d 720 (6th Cir. 2021) (same). In *United States v. Owens*, however, the Sixth Circuit distinguished *Tomes* and *Wills* and carved out what it called a "middle path," holding that as long as it is not the *sole* basis for finding extraordinary and compelling circumstances, "a district court may include, along with other factors, the disparity between a defendant's actual sentence and the sentence that he would receive if the [FSA] applied." 996 F.3d 755, 763 (6th Cir. 2021). This approach, the court explained, was "not foreclose[d]" by *Tomes* and *Wills*, which considered only whether FSA sentence disparity could *alone* constitute an extraordinary and

compelling circumstance. *Id.* It also accorded, the court noted, with the conclusions of the Tenth Circuit and "[m]any district courts across the country[,] . . . that a defendant's excessive sentence because of mandatory-minimum sentences since mitigated by the [FSA] may, alongside other factors, justify compassionate release." *Id.* at 762 (collecting cases); *see, e.g.*, *United States v. Maumau*, 993 F.3d 821 (10th Cir. 2021); *United States v. McGee*, 992 F.3d 1035 (10th Cir. 2021).

Less than a month later, however, in *United States v. Jarvis*, another panel of the Sixth Circuit, in disagreement with the *Owens* court's conclusion, construed *Owens* as implicitly overruling the decision in *Tomes*, and held that, when "[f]orced to choose between conflicting precedents," it was obligated to follow *Tomes*, the earlier decision. 999 F.3d 442, 445-46 (6th Cir. 2021) ("*Tomes*, decided before *Owens*, 'remains controlling authority' that binds this panel." (quoting *Salmi v. Sec'y of Health & Hum. Servs.*, 774 F.2d 685, 689 (6th Cir. 1985))). Within days of *Jarvis*, another panel reached a similar conclusion in an unpublished opinion. *See United States v. Corona*, No. 20-6309, 2021 U.S. App. LEXIS 17243, at *6-7 (6th Cir. June 8, 2021) (explaining that the "conclusion [in *Owens*] cannot be squared with *Tomes*" and "declin[ing] . . . to follow *Owens* because *Tomes* was decided first and therefore controls" (citing *Jarvis*, 999 F.3d at 445-46)).

Ironically, however, both *Jarvis* and *Corona* appear to violate the very rule they rely upon: The earlier holding prevails. The *Owens* court specifically described

its approach as forging a "middle path"—*i.e.* distinguishing *Tomes* and *Wills*, rather than overruling them. *Owens*, 996 F.3d at 760-61, 763 ("Although *Wills* and *Tomes* bear upon Owens's case, Owens's circumstances are factually distinguishable. Owens points to the fact that his lengthy sentence resulted from exercising his right to a trial and to his rehabilitative efforts as additional factors that *considered together* constitute an extraordinary and compelling reason meriting compassionate release." (emphasis added)). This distinction was essential to the court's decision, and is therefore, part of its holding. *Id.*; *see Wright v. Spaulding*, 939 F.3d 695, 701-02 (6th Cir. 2019) (explaining that "a court's conclusion about an issue [is] part of its holding" where it "is necessary to the judgment," where "the court intended to rest the judgment . . . on its conclusion about the issue," and where "the court considered the issue and consciously reached a conclusion about it"); *see also Jarvis*, 999 F.3d at 449-50 (Clay, J., dissenting).

The law of the circuit doctrine thus required subsequent panels like *Jarvis* to take at face value *Owens*'s description of what it was doing (*i.e.* distinguishing, rather than overruling), as well as its summary and construction of *Tomes* and *Wills*. *Cf. United States v. Hardin*, 539 F.3d 404, 412 (6th Cir. 2008) ("Our summary of [the prior case at issue] . . . was not essential to our resolution . . . and that summary is therefore dicta."). Nevertheless, *Jarvis* and *Corona* simply disagreed with the way that *Owens* had interpreted *Tomes* and *Wills*, and, rather than distinguishing *Owens*,

they held that *Owens*'s reading of *Tomes* had not been "faithful." *Jarvis*, 999 F.3d at 446 (majority opinion); *accord Corona*, 2021 U.S. App. LEXIS 17243, at *6-7. Because only *Jarvis* is published, the Court focuses its analysis there.

*Jarvis*'s primary objection to *Owens* stemmed from the way in which the *Owens* court had interpreted the extraordinary and compelling circumstances at issue in *Tomes* and *Wills*. Specifically, the *Jarvis* court argued that *Owens*'s description of *Tomes* was "inaccurate" because "the defendant in *Tomes* in fact presented five reasons for granting relief," not two, as the *Owens* court stated. *Jarvis*, 999 F.3d at 446. Likewise, the *Jarvis* court also cited additional grounds presented by Wills that it claimed were not considered by the court in *Owens*. *Id.* But in levying these criticisms, *Jarvis* improperly focused its attention on the factors presented to the district courts in the first instance, rather than those actually discussed by the appellate panels in *Tomes* and *Wills*.

For example, *Jarvis* cites "[Tomes's] contention that his 'rehabilitation, strong family support, and apparently inequitable sentence were extraordinary and compelling reasons for release.'" *Jarvis*, 999 F.3d at 446 (quoting *Tomes*, 990 F.3d at 502). But this quotation was pulled from the *Tomes* panel's recitation of what Tomes had argued below at the district court. *Tomes*, 990 F.3d at 502. The only factors the *Tomes* panel analyzed in the context of whether the petitioner presented extraordinary and compelling circumstances on appeal were those referenced in

*Owens*: Tomes's alleged asthma and post-FSA sentence disparity. *Id.* at 504-05. Likewise, none of the factors *Jarvis* cited as being present in Wills's "handwritten request for relief" to the district court were raised on appeal. *Jarvis*, 999 F.3d at 446; *see* Pro Se Appellant's Brief, *Wills*, 991 F.3d 720 (No. 20-6142).

In other words, contrary to *Jarvis*'s assumptions, it is not "clear that the court[s] [in *Tomes* and *Wills*] considered" these other potential grounds for relief "[or] consciously reached a conclusion about [them]." *Wright*, 939 F.3d at 702 (citing *Carroll v. Carroll's Lessee*, 57 U.S. 275, 287 (1853)). *Jarvis*, therefore, should not have treated those aspects of the decisions as precedential. *See id.*; *see also Nemir v. Mitsubishi Motors Corp.*, 381 F.3d 540, 559 (6th Cir. 2004) ("[Q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925))). Likewise, as the *Jarvis* dissent pointed out, because *Tomes* explicitly affirmed the district court's denial of compassionate release on the § 3553(a) factors alone, the entire discussion about extraordinary and compelling circumstances that followed should have been treated as dicta. *Jarvis*, 999 F.3d at 449-50 (Clay, J., dissenting).

In sum, *Jarvis* and *Corona* manufactured a conflict where there was none by ignoring *Owens*'s construction of *Tomes* and *Wills* and its explicit assertion that it was distinguishing itself from, rather than overruling, them. Doing so required

assuming that the panels in *Tomes* and *Wills* had considered and rejected arguments not raised on appeal or discussed in writing.

It also violated the law of the circuit doctrine, regardless of whether the latter panels agreed with the way in which the *Owens* court had described its analysis. *See Wright*, 939 F.3d at 700; *Grundy Mining Co. v. Flynn*, 353 F.3d 467, 479 (6th Cir. 2003) ("[A panel of the Sixth Circuit is] not free to pick and choose the portions of a prior published decision that [it] will follow and those that [it] will disregard. Nor do[es] [it] enjoy greater latitude in situations where [its] precedents purportedly are tainted by analytical flaws . . . .").

> In our system, litigants are bound by precedent all the time. Even precedent that [appellate courts] later recognize was incorrect. [W]hen . . . precedent cuts against a party, . . . that party [must] (1) distinguish it, (2) persuade [the Sixth Circuit] to overrule it en banc, or (3) persuade the Supreme Court to correct [the] error. *In the meantime, [the Sixth Circuit] go[es] on applying it.*

*Wright*, 939 F.3d at 709 (Thapar, J., concurring) (emphasis added).

The court in *Jarvis* should have put its disagreement with *Owens* aside, rather than creating an intra-circuit split, but it did not. In the face of this conflict, the Court will follow *Owens*, the earlier and better-reasoned decision, and will consider FSA sentence disparity as one factor in the extraordinary and compelling circumstances analysis.

Here, Wingate faces a significant disparity. At sentencing, the Court was required to impose a mandatory seven-year term of imprisonment for the first § 924(c) conviction and two mandatory consecutive twenty-five-year terms on the other two § 924(c) convictions. (PSR ¶ 92). A total of fifty-seven years. Had Wingate not yet had a final sentence at the time the FSA went into effect, he would have faced a much shorter mandatory minimum of seventeen years.[1] *See* 18 U.S.C. § 924(c)(1)(A)(i)-(ii). The difference between the *de facto* life sentence Wingate has now and a term of years cannot be overstated, and would warrant a reduction in sentence if accompanied by another factor. *See Owens*, 996 F.3d at 763. Wingate's rehabilitative strides over the last decade are sufficient to constitute that other factor.

### c. Rehabilitation

Wingate was arrested ten years ago—nearly to the day—and, as the Government concedes, he has made "laudable" efforts to rehabilitate himself in the

---

[1] Wingate and the Government disagree as to this computation. (ECF No. 343, PageID.4468; ECF No. 344, PageID.4541). Because at the time of Wingate's trial, the escalating twenty-five-year mandatory minimums applied to the later two § 924(c) counts, regardless of whether the firearms were "used" (as opposed to "carried" or "possessed"), the jury was only tasked with finding "use" (*i.e.* brandishing) on the first § 924(c) count. (ECF No. 198, PageID.1964) ("To establish 'use,' the Government must prove active employment of the firearm during and in relation to *the crime charged in Count 2*." (emphasis added)); *see* 18 U.S.C. § 924(c)(1)(A)(ii) (imposing a mandatory minimum of seven years for brandishing). Although the jury might have found brandishing on the latter two counts if asked, district courts cannot unilaterally make such findings to impose a higher mandatory minimum—that can only be done by the jury. *See Alleyne v. United States*, 570 U.S. 99, 116 (2013) (holding that "facts that increase mandatory minimum sentences must be submitted to the jury"). Thus, if Wingate had been subject to FSA § 403(a) resentencing, this Court would have been obligated to sentence him to a minimum of seventeen years (seven years for the first § 924(c) count and five years each for the latter two § 924(c) counts).

intervening period. (ECF No. 347, PageID.4642). For example, while at Milan Detention Center, Wingate, who had led a study group at a mosque prior to his arrest, delivered daily sermons and continued to facilitate study groups regarding Islam. (PSR ¶ 88). Following his sentencing, he has continued to demonstrate a commitment to rehabilitation, by, among other things: 1) completing evidence-based recidivism reduction courses focused on addressing criminal thinking, cognitive-behavioral therapy, and anger management; 2) completing continuing education courses in sociology, parenting, computer science, typing, and other subjects; 3) recommitting himself to his faith and providing mentorship and guidance to younger inmates; 4) rising through the ranks of USP Atwater's Food Service Department while completing the Culinary Arts Degree Program and becoming certified in food safety protocol; and 5) volunteering as a companion to help incarcerated people with mental health needs, including monitoring individuals on suicide watch. (ECF No. 343, PageID.4770; ECF No. 343-1, PageID.4506-11; ECF No. 341-1, PageID.4492-4504; ECF No. 352, PageID.4677).

At the sentencing hearing, the Court recognized that Wingate would not "have the ultimate carrot of looking forward to getting out" in light of the length of his sentence, but nevertheless expressed hope that Wingate would "do some good" in prison by "teaching others and learning more." (ECF 218, PageID.2179). Based on the Court's review of the evidence, Wingate appears to have done just that.

One letter from an individual with whom Wingate has been incarcerated attests to the fact that Wingate helped him reconnect with his family and taught him "that life is 'choice driven' and [that he] can either choose to be part of the problem, or . . . can choose to be part of the solution." (ECF No. 343-1, PageID.4507). Another writer describes how Wingate has been a positive role model for him and other younger inmates: "He speaks to us about mistakes that he's made in his own life. Mistakes that he's made when we was maybe around our age. Then he gives us game on how to more appropriately deal with certain situations in a civilized manner." (*Id.* at 4508). Yet another letter recounts how Wingate "calmly intervene[d] and resolve[d] a heated debate between two different gang members, before the misunderstanding could escalate." (*Id.* at 4510). These letters depict a different man than the one who appeared before the Court at sentencing.

The credibility of these letters is bolstered, moreover, by multiple statements of support from Wingate's supervisors in USP Atwater's Food Service Department. During the pandemic, Wingate has been one of only a small number of essential workers assigned to the Food Service Department and, by all accounts, appears to have risen to the occasion. The letters from Wingate's supervisors describe how he "worked his way [up from dishwasher] to [butcher,] the highest position in food service." (ECF No. 352, PageID.4677). They further report that he is "one of the best workers . . . in the kitchen," "has proven himself as a good role model to other

inmates," and "requires less supervision from staff" than other inmates. (ECF No. 352, PageID.4673, 4675, 4677).

Taken together, these six letters offer persuasive evidence that Wingate has been a force for good in prison over the last several years, despite the seeming impossibility of release, and that he has substantially matured since his sentencing.

Wingate's three minor disciplinary infractions, all of which are more than a year old, do not alter this conclusion. For example, Wingate was written up in June 2020 for mail abuse, however, the "abuse" was simply a mistake by a paralegal who failed to appropriately label a piece of mail addressed to Wingate. (ECF No. 346-3, PageID.4632). Similarly unconcerning is Wingate's sanction for possessing an unauthorized item in July 2018. (*Id.*). As his attorney explained during the hearing, Wingate was written up for forgetting to return a work key after his shift had ended; he admitted the mistake and returned the key the following day. The glowing reports from Wingate's supervisors make it clear that this conduct, while perhaps careless, is not indicative of Wingate's overall performance in custody. The Court reaches the same conclusion with respect to Wingate's write up for being absent from assignment in September 2015. (*Id.* at 4633). Accordingly, the Court concludes that Wingate has made significant rehabilitative strides over the last ten years.

Although these rehabilitative efforts do not alone justify a reduction in sentence, *see* 28 U.S.C. § 994(t), they do when viewed collectively with the gross

disparity created by the non-retroactivity of FSA § 403(a). *See, e.g.*, *United States v. Baker*, No. 10-20513, 2020 U.S. Dist. LEXIS 145670, at *8-9 (E.D. Mich. Aug. 13, 2020); *see also, e.g.*, *United States v. Pollard*, No. 10-633-1, 2020 U.S. Dist. LEXIS 144383, at *19 (E.D. Pa. Aug. 12, 2020); *United States v. Clausen*, No. 00-291-2, 2020 U.S. Dist. LEXIS 131070, at *17 (E.D. Pa. July 24, 2020); *United States v. Wade-Waiver*, No. 2:99-CR-00257-CAS - 3, 2020 U.S. Dist. LEXIS 69474, at *16 (C.D. Cal. Apr. 13, 2020); *United States v. Chan*, No. 96-cr-00094-JSW-13, 2020 U.S. Dist. LEXIS 56232, at *15 (N.D. Cal. Mar. 31, 2020); S. Rep. No. 98-225, at 55 (1983) (explaining that a reduction in sentence would be appropriate where there is "an unusually long sentence" or a subsequent change in the prescribed term of imprisonment for a given crime). Accordingly, the Court concludes that Wingate has demonstrated extraordinary and compelling circumstances under 18 U.S.C. § 3582(c)(1)(A)(i).

## III.   Section 3553(a) Factors

The last step a district court contemplating a motion for compassionate release must take is to consider the applicable sentencing factors listed in 18 U.S.C. § 3553(a). "'[A]s long as the record as a whole demonstrates that the pertinent factors were taken into account by the district court[,]' a district judge need not 'specifically articulat[e]' its analysis of every single § 3553(a) factor." *Id.* at 1114 (quoting *United*

*States v. Curry*, 606 F.3d 323, 330 (6th Cir. 2010)). With that in mind, the § 3553(a)

factors are as follows:

> **(a) Factors to be considered in imposing a sentence.** The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—
>
> **(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> **(2)** the need for the sentence imposed—
>
> > **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > **(B)** to afford adequate deterrence to criminal conduct;
> >
> > **(C)** to protect the public from further crimes of the defendant; and
> >
> > **(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> **(3)** the kinds of sentences available;
>
> **(4)** the kinds of sentence and the sentencing range established for—
>
> > **(A)** the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—
> >
> > [. . .]
>
> **(5)** any pertinent policy statement—
>
> > [. . .]
>
> **(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> **(7)** the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The Court agrees with the Government that under the § 3553(a) factors, immediate release is inappropriate, however, "[i]t bears remembering that compassionate release is a misnomer. 18 U.S.C. § 3582(c)(1)(A) in fact speaks of sentence reductions." *United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020). Under § 3582(c)(1)(A), "[a] district court [can], for instance, reduce but not eliminate a defendant's prison sentence." *Id.*; *see, e.g.*, *United States v. Ball*, No. 06-cr-20465, 2021 U.S. Dist. LEXIS 107594, at *17 (E.D. Mich. June 9, 2021) (reducing sentence from 360 to 240 months); *United States v. McDonel*, No. 07-20189, 2021 U.S. Dist. LEXIS 6401, at *22 (E.D. Mich. Jan. 13, 2021) (reducing sentence from 1,285 to 240 months). It is this type of relief that the Court deems appropriate here.

As noted above, Wingate survived a traumatic childhood and has been caught up in the criminal legal system since the age of fifteen. (PSR ¶¶ 72-74, 84). When Wingate was released from prison in 2010 and succeeded in opening a Halal deli, it seemed like he might finally be able to make fresh start. (*Id.* ¶¶ 74, 90). But after only a few months, Wingate was faced with imminent closure if he could not come up with $15,000 to bring the space "up to code." (*Id.* ¶ 90). The causal link between this financial predicament and Wingate's choice, weeks later, to take part in the instant robberies is not hard to draw. *See* Justin Jouvenal, *A Quintessentially American Crime Declines: Robbing Banks Doesn't Pay As It Used To*, WASH. POST

(Oct. 6, 2016), https://www.washingtonpost.com/local/public-safety/a-quintessentially-american-crime-on-the-decline--robbing-banks-doesnt-pay-as-it-used-to/2016/09/29/4f54a0a6-e7e9-437c-b484-151a337b0e0a_story.html [https://perma.cc/CL88-2SB3] (citing an expert's opinion that "[b]ank robbery is now largely a crime of the desperate"). While Wingate's painful upbringing, history of incarceration, and financial desperation by no means justified his participation in the instant offenses, they do provide important context to his criminal conduct, progress in prison, and proposed release plan.

Wingate's role in the instant robberies was significant. Although Wingate did not plan the heists or discharge a weapon while carrying them out, he did threaten several bystanders at gunpoint and strike someone in the head with his gun. (PSR ¶¶ 12-23). Most reprehensible of all, Wingate tricked his son into participating in this criminal conspiracy despite the ruinous effect it could have on the young man's life. (*Id.* ¶¶ 20-22, 81). And all of this took place while Wingate was on parole for second-degree murder. (*Id.* ¶ 74). It was against this backdrop that the Court noted at Wingate's sentencing that "even without the mandatory sentences . . . [he] would probably get at least [twenty-five years] from [the Court]." (ECF No. 218, PageID.2180).

But much has changed since that hearing. For one thing, as described in Section II.C, Wingate has made significant progress towards rehabilitation. *See*

*Pepper v. United States*, 562 U.S. 476, 504-05 (2011). In addition, Raynard Crowe, whose forty-four year sentence the Court relied upon in its original analysis of disparity under the § 3553(a) factors, was resentenced under the FSA in 2019 and later granted compassionate release due to health conditions. *See United States v. Crowe*, No. 11-20481, 2020 U.S. Dist. LEXIS 228674, at *16-18 (E.D. Mich. Dec. 7, 2020). Desmond Rodgers, another of Wingate's co-defendants, has also been granted compassionate release. *United States v. Rodgers*, No. 11-20481, 2020 U.S. Dist. LEXIS 203475, at *13 (E.D. Mich. Nov. 2, 2020) Accordingly, in addition to the disparity engendered by FSA § 403(a)'s non-applicability to Wingate, which the Court already discussed in the context of extraordinary and compelling circumstances, Wingate now also faces a significant disparity in light of the resentencing of his co-defendants. Moreover, as is apparent from the passage of FSA § 403(a), mandatory twenty-five-year stacked sentences are not a just punishment for a first-time § 924(c) offender.

In its evaluation of the § 3553(a) factors, the Court gives "great weight," *United States v. Wright*, 991 F.3d 717, 719 (6th Cir. 2021) (quoting *United States v. Adkins*, 729 F.3d 559, 571 (6th Cir. 2013)), to Wingate's evidence of rehabilitation in prison, which "provides the most up-to-date picture of [his] 'history and characteristics,'" as well as his sentence disparity. *Pepper*, 562 U.S. at 492 (quoting

18 U.S.C. § 3553(a)(1)). Nevertheless, the Court is not persuaded that outright release is the proper remedy at this time.

Wingate's rehabilitation is significant. Indeed, without such significant progress, the Court would not have found extraordinary and compelling reasons for a reduction in sentence. But Wingate's rehabilitation is not so exhaustive as to persuade the Court that it would be appropriate to release him today, particularly in the absence of a thorough release plan. Compared to Crowe, for example, who offered a detailed re-entry plan and had completed the eighteen-month Life Connections program, Wingate's engagement with BOP programming has been less comprehensive. *Crowe*, 2020 U.S. Dist. LEXIS 228674, at *12-13.

Likewise, although Wingate's arrest and prosecution has already served the aims of general deterrence, the fact that Wingate committed the instant offenses less than a year after being released from an eighteen-year period of incarceration gives the Court pause with respect to specific deterrence. It is not clear from the record that the ten years Wingate has spent in custody for the instant offenses would deter him and protect the public from further crimes if Wingate was again put in a situation of financial hardship like the one that led to his participation in the instant offenses. And unfortunately, such hardships are to be expected. *See* Cameron Kimble & Ames Grawert, *Collateral Consequences and the Enduring Nature of Punishment*, BRENNAN CTR. FOR JUST. (June 21, 2021), https://www.brennancenter.org/our-

work/analysis-opinion/collateral-consequences-and-enduring-nature-punishment

[https://perma.cc/GF8K-JX55] ("[A] prior criminal conviction is devastating to an

individual's earning prospects, but a prison record all but ensures a lifetime

straddling the poverty threshold."); Jaboa Lake, *Criminal Records Create Cycles of*

*Multigenerational Poverty*, CTR. FOR AM. PROGRESS (Apr. 15, 2020),

https://www.americanprogress.org/issues/poverty/news/2020/04/15/483248/crimin

al-records-create-cycles-multigenerational-poverty/        [https://perma.cc/VT3A-

K83L]. For this reason, Wingate's release plan, moving in with his sister in Ohio

and looking for work, leaves far too much to chance.

Instead, the Court, considering Wingate's guidelines and balancing his

substantial rehabilitation with the seriousness of his offense, finds that the § 3553(a)

factors support a reduction in sentence to seventeen years and one day. Although

this is a significant variance, the Court believes a reduction of this scope promotes

respect for the law. *See United States v. Stern,* No. 5:07-CR-00524, 2008 U.S. Dist.

LEXIS 102071, at *30 (N.D. Ohio Dec. 17, 2008) ("Respect for the law is promoted

by punishments that are fair, . . . not those that simply punish for punishment's sake."

(citing *United States v. Cernik*, No. 07-20215, 2008 U.S. Dist. LEXIS 56462, at *25

(E.D. Mich. July 25, 2008))). It bears repeating that the "Court's overarching duty"

under the § 3553(a) factors is "to 'impose a sentence sufficient, *but not greater than*

*necessary*' to serve the purposes of sentence." *Pepper*, 562 U.S. at 493 (emphasis

added) (quoting 18 U.S.C. § 3553(a)). This sentence does that. It is a just punishment that promotes respect for the law by mitigating a significant disparity while also allowing Wingate the continued benefit of additional BOP programming.

## CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Wingate's Motions [340, 343] are **GRANTED in part and DENIED in part**.

**IT IS FURTHER ORDERED** that the custodial portion of Wingate's sentence is **REDUCED** to a total of **SEVENTEEN (17) YEARS and ONE (1) DAY**.

**IT IS FURTHER ORDERED** that all the non-custodial provisions of the original judgment, including a three-year term of supervised release, are re-imposed.

**IT IS FURTHER ORDERED** that an amended judgment will enter.

**SO ORDERED**.


s/ Arthur J. Tarnow
Arthur J. Tarnow
Dated:  July 23, 2021            Senior United States District Judge